**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION**

**DR. VERN CHRISTENSEN**  **PLAINTIFF**

**V.**  **CASE NO. 1:08CV74**

**GEICO GENERAL INSURANCE COMPANY**  **DEFENDANT**

## ORDER

Plaintiff, Vern Christensen, was injured in a car wreck in May 2005. There is no dispute the other driver was at fault for the accident. That driver's insurance paid its policy limit of $50,000 to Christensen. Christensen now seeks recovery from defendant, GEICO General Insurance Company ("GEICO"), which wrote his underinsured motorist policy.

Christensen claims he suffers from a herniated disc in his neck and a nerve injury as a result of the accident. He seeks damages for lost earnings, lost earning capacity, pain, emotional distress, medical bills, and future medical expenses.

GEICO claims Christensen's herniated disc resolved itself and any future medical treatment would go to correct a degenerative defect not caused by the accident. Further GEICO argues Christensen does not have any lost earning capacity damages because his business revenues have increased following the accident.

A two day bench trial in this matter was held begining July 20, 2009. Pursuant to Federal Rule of Civil Procedure 52 the court makes the following findings of fact and conclusions of law.

Christensen is a self-employed podiatrist in Amory, Mississippi. On Wednesday May 25, 2005, a third party driver rear-ended Christensen. Christensen immediately experienced weakness, numbness, and tingling in both his arms. He was transported to the emergency room.

After an initial evaluation, Christensen was transported to another hospital, North Mississippi Medical Center, where he was examined by an orthopedic surgeon, Dr. Stimpson. Christensen was evaluated through the use of both an MRI and a CT scan. At that time there was swelling at C-6 and C-7, but Christensen was sent home from the hospital.

He rested for two normal workdays returning to his office the Tuesday following Memorial Day.

The next month Christensen saw his neurologist, Dr. Reynolds P. McCain, for the first time. Christensen visited McCain because of continuing weakness, tingling, and numbness. Those symptoms lasted for three weeks in both arms. After that period the left arm symptoms cleared up. Relying on the MRI and CT scan conducted on the day of the accident, McCain found "a small focal right paracentral herniated nucleus puposus at C 6-7, superimposed upon a broad based disc bulge/ostcophyte complex, . . . [and a] prominent bilateral foraminal, narrowing right greater than left." Secondary to those finding, McCain also noted the nerve "canal is borderline in diameter" and Christense has "a remote appearing clay shoveler's deformity associated with the spinous processes at C 6 and C 7, . . . moderate multilevel disk degenerative changes in the mid and lower thoracic spine, . . . [and] minimal anterior compression deformities . . . likely related to . . . degenerative change[s]."

In layman's terms, Christensen was suffering from a pinched nerve in his neck and a herniated disc. McCain also noted there was a preexisting condition revealed by the MRI. Christensen suffered from a disc bulge referred to as an osteophyte complex. McCain desribed this condition as arthritis and a type of bone spur. Christensen also suffered from a foraminal narrowing which aggravates the nerve passing through the foramen opening. Finally, the MRI indicated Christensen had a clay shoveler's deformity at the C-6 and C-7 level. This clay

shoveler's deformity indicates an old fracture which can cause pain symptoms in the arm.

Based on those findings, McCain recommended general conditioning exercises, exercises for strengthening the right upper extremity, and the drug Neurotin. Christensen declined the Neurotin.

In July 2005, Christensen saw Stimpson again after he experienced pain symptoms while performing simple household chores. Christensen was scheduled for a September 2005 bone scan.

On October 18, 2005 Christensen was involved in another automobile accident. Christensen testified he was not injured in this accident. He did, however, go to the hospital with his son who suffered a neck strain. While at the hospital, Christensen stated he felt some discomfort, but he made clear that he always felt some discomfort. A series of X-Rays was performed at this time showing no changes in Christensen's condition. Before the end of the month Christensen visited McCain for a follow up on the September bone scan. Christensen's condition remained similar to his first visit with McCain.

On June 8, 2006, McCain released Christensen from medical care. McCain's findings at the time indicated Christensen had reached maximum medical recovery.

McCain next saw his patient two years later on August 15, 2008. At that time McCain noted Christensen had weakness in his right extremity. However, the cause of the symptoms had changed. The bulging disc previously present had improved to the point it was no longer visible on an MRI. At the same time, Christensen's arthritis had gotten worse.

The instant dispute is one based in the law of contract. However, in order to determine GEICO's liability under contract the court must first look to the underlying tort of negligence. Both parties concede the driver who hit Christensen was under a duty to operate his vehicle in a

reasonable manner and that he violated that duty causing the accident at issue.

GEICO does question whether there is sufficient evidence that the wreck caused Christensen's injuries. McCain testified to a reasonable degree of medical certainty that Christensen's injuries were caused by the wreck, that his condition will worsen over time, and that he will need surgery in the future. GEICO did not present a medical expert. GEICO's cross-examination of McCain revealed that he believed Christensen's injuries immediately following the accident were the result of the crash. However, McCain stated it was impossible to tell if the injuries present in 2008 were caused by the crash or were the result of a degenerative condition from which Christensen suffered.

In evaluating whether the underlying wreck caused Christensen's specific damages the court addresses them separately.

The court first addresses Christensen's claim for medical expenses. There is sufficient evidence to show a probability that Christensen's first medical treatments were caused by the wreck. It is less clear that Christensen can prove by a preponderance of the evidence his future needs for medical care were caused by the accident.

Exhibit P-1 establishes $11,320.63 in medical bills caused by the accident. Christensen is entitled to recover those expenses. These expenses relate to Christensen's two hosptial visits on the day of the crash and his ongoing treatment by McCain.

Christensen also seeks between $34,404 and $47,855 for a future surgical procedure. This amount is supported by the future care cost projections presented as exhibit P-5. The question before the court is not the cost of the surgery, but whether Christensen has proven the surgery is necessary and was caused by the wreck.

Christensen's attorneys stipulated there was no reference to a need for surgery in

McCain's notes prior to July of 2008. McCain explained this by stating he had been talking to Christensen throughout their visits about the possibility of surgery, but had not put it in his notes. McCain stated he would normally make a referral to a surgeon for a patient who needed this type of procedure, but had not done so in this case. McCain's explanation here was that Christensen was a doctor and was familiar with the need to see a surgeon. Christensen never made such a visit.

McCain did make a note regarding surgery in July of 2008. This notation came two years after Christensen had been released from care. Christensen came in for this visit after carrying a backpack during a golf tournament and experiencing pain. As discussed above the examination at this time revealed the herniated disc caused by the wreck had cleared up and the degenerative arthritic condition had worsened. McCain's testimony is this arthritic condition existed independently of the wreck. McCain did state trauma could accelerate arthritis, but he did not state to a medical probability that is what happened in this instance.

McCain stated that any possible surgery would be to move bone spurs away from Christensen's nerve and remove bone osteophyte complexes. McCain went on to state the osteophytes existed before the car wreck and there was no way to tell if the wreck worsened their condition.

Based on these facts the court finds Christensen has failed to prove the accident caused the need for any future surgery. There is an indication that Christensen needs surgery, but it is not any more probable that the wreck caused this need than it is that Christensen's preexisting conditions caused the need for the surgery.

Christensen seeks recovery for lost income because his practice would have to be closed while he underwent this surgery. The finding that GEICO is not liable for the surgery eliminates

these damages from consideration

The court next addresses Christensen's claim for loss of earning capacity. Christensen argues he can no longer perform many of the types of surgery for which he is trained. He indicates this limitation has greatly reduced his earning capacity. GEICO counters that Christensen has significantly increased his revenues since the accident evidencing that he has successfully mitigated all these damages. Additionally, GEICO argues Christensen has failed to offer specific proof of the amount of any potential damages.

Christensen's injury prevented him from preforming some types of surgery. After the accident Christensen expanded his practice into other areas significantly increasing his revenues. Mississippi law imposed on him such a duty to mitigate his damages. *See Buras v. Shell Oil Co.*, 666 F. Supp. 919, 924 (S.D. Miss. 1987) (citing *Pelican Trucking Co. v. Rossetti*, 167 So.2d 924, 927 (Miss. 1964) (overruled in part); *Levy v. J.A. Olson Co.*, 115 So.2d 296, 298 (Miss. 1959); 25 C.J.S. *Damages* § 33 (1966)).

In 2003 Christensen's business had gross receipts of $257,479. That number increased to $375,094 in 2004 and $586,436 in 2005. In 2006, the year after the accident, Christensen's gross receipts remained steady at $580,082. In 2007 the gross receipts again crept upwards to $602,301. During this period, the business' profits increased from $88,033 to $242,960.

Christensen's proof his business failed to grow at the rate it would have is his testimony that he can no longer perform some types of surgeries and the expert testimony of Juliette Mays.

The court has no doubt that Christensen can not perform some surgeries previously covered by his practice. However, there is little proof this inability has actually affected Christensen's finances.

Christensen says he can no longer perform some surgeries. However, it is unclear

Christensen would actually have time to perform these surgeries if able. Additionally, it is impossible to tell how many such surgeries Christensen could and would perform.

All mortals are constrained by the bounds of time. The time Christensen spent on other areas of his practice increased. Christensen's own exhibits show his income from the sale of durable medical equipment increased from $18,054.49 in 2004 to more than $70,000 in both 2007 and 2008. Common sense indicates Christensen had to spend more time on this area of his practice to see such an extraordinary increase in income.

Likewise Christensen took on surgeries he could perform which ate into the time he could have performed the now impossible surgeries. Evidence submitted by Christensen shows his income from musculoskeletal system surgeries increasing from $79,037 in 2004 to $143,321 in 2005. The year of the accident was Christensen's peak year for income from these types of surgeries. His income decreased slightly the next year to $133,851. In 2007 Christensen only earned $100,241 from these types of surgeries. In 2008 this type of income was down to $72,040. These numbers show Christensen's surgical practice actually growing after the accident. Eventually, that growth would stop and his income would decline. For at least for some time after the accident Christensen put his time into other types of surgeries. When that time was invested, Christensen's income rose. The same pattern can be seen in Christensen's income from nervous system surgeries.

These numbers raise serious questions about whether Christensen could actually derive any additional income if he was physically capable of performing additional surgeries. To this point he has offered expert testimony. Juliette Mays, a licensed CPA, testified Christensen was losing $4,743 per month due to lost opportunities.

GEICO challenges the admissibility of Mays' opinion. The Supreme Court has charged

trial court judges with the responsibility of acting as gatekeepers in determining when expert testimony is admissible. *Daubert v. Merrell Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). *Daubert* requires that "when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." *Watkins v. Telesmith, Inc.*, 121 F.3d 984, 988-89 (5th Cir. 1997). Determining reliability requires assessing "whether the reasoning or methodology underlying the testimony is scientifically valid." *Daubert*, 509 U.S. at 592-93. Relevance rests on "whether [that] reasoning or methodology properly can be applied to the facts in issue." *Id.* at 593.

In this matter, however, the court does not have to decide if Mays' opinion testimony[1] is admissible. The fact of the matter is that even if her testimony meets the minimal requirements of admissibility, it is not credible. Mays derived her $4,743 figure by simply taking the average amount billed for the nine months prior to the accident for two types of surgeries Christensen can no longer perform. She did not take into account other additional surgeries Christensen may have performed in lieu of these procedures. She did not consider Christensen's expenses related to these surgeries.

Additionally, Mays admitted she had never performed these type of calculations before, she did not do any research into the proper method for completing such calculations, and she was unaware of any literature that supported her calculations. Mays testified it was impossible to determine the actual loss for a growing business. As such Mays' calculations offer nothing to the court.

Under Mississippi law "damages which are uncertain, contingent, or speculative are not

---

[1] Mays also testified to a number of underlying facts as Christensen's CPA. That fact testimony is admissible.

recoverable." *Hudson v. Farrish Gravel Co.*, 279 So.2d 630, 635 (Miss. 1973). Christensen has proven he can no longer perform some types of surgeries, but he has failed to prove any loss. Any monetary award for this condition would be speculative and is unjustified.

Finally, the court addresses Christensen's claims for non-economic damages. MISS. CODE ANN. § 11-1-69 provides that in "any civil action for personal injury there may be a recovery for pain and suffering and loss of enjoyment of life." Pain and suffering damages are not easily quantifiable and must be left with the sound discretion of the trier of fact. *Simeon v. T. Smith & Son, Inc.*, 852 F.2d 1421, 1427 (5th Cir. 1988)

Christensen offered proof that he suffered great pain both at the time of the accident and in the months that followed. Immediately following the crash, Christensen had pain and also suffered from the loss of feeling in his upper extremities. Christensen was placed on a backboard and transported by ambulance to the hospital. Upon leaving the hospital Christensen described intense pain. He needed to use three or four pillows just to ride to his house after having been given pain medication.

In the months that followed Christensen continued to suffer from weakness and tingling. He also described a worsening of these symptoms if he placed any strain on his back. This has affected Christensen's ability to grip, feel, touch and hold objects. Further, Christensen suffers from a burning sensation in his neck and right hand.

In addition to his physical pain, Christensen also suffered mental anguish. He describes a period of fear immediately following the accident. It is obvious he suffered as a result of being unable to perform some types of surgeries as discussed above. Other portions of his practice require him to assume positions that exacerbate his physical pain. The thought of being unable to continue with his work because of that situation increased Christensen's suffering.

Christensen may well suffer some from these ailments for the rest of his life. Clearly he has proven the right to some compensation for pain and suffering.

It is always difficult to determine an amount appropriate in such instances. The court thus looks to prior decisions in rendering its award.

Recently the Mississippi Supreme Court upheld an award of $50,000 for pain and suffering in a car wreck case. *City of Jackson v. Spann*, 4 So.3d 1029, 1038 (Miss. 2009). In that case the plaintiff had $26,875.53 in past medical bills. *Id*. She also suffered from more conditions, including two bulging discs in her neck, a bulging disc in her back, joint hypertrophy, and a meniscus tear, than did Christensen.

At the opposite end of the spectrum is a car wreck case in which the plaintiff was awarded $511.55 in hedonic damages. *Clark v. Deakle*, 800 So.2d 1227, 1231 (Miss. App. 2001). In this instance the plaintiff had $11,488.45 in medical expenses. *Id*. at 1230. However, the plaintiff did not seek medical treatment until four days after the accident and suffered only from a muscle strain. *Id*. These medical expenses are more in line with those suffered by Christensen. However, the pain and suffering in *Clark* is significantly less than Christensen's injury.

Other awards fail to fit neatly between these two extremes. For instance in *Quave v. Ray*, the trial court awarded $7500 in pain and suffering damages for a plaintiff who originally did not believe she was injured, but later was found to have some limited although permanent back injury. 377 F. Supp. 125, 130 (D.C. Miss. 1974).

In the instant matter, Christensen has proven he felt severe pain around the time of the injury and has consistent pain since that time. The pain Christensen suffers is not particularly severe at present. This pain does not prevent Christensen from taking part in most normal life

activities.  For instance his testimony revealed that he was still able to play a few holes of golf.  The court also witnessed Christensen's movements.  He is able to raise his arms above his head without difficulty and can doubtlessly perform many basic tasks without too great a discomfort.

Based on this evidence the court finds Christensen is entitled to $40,000 in hedonic damages.  This amount is eighty percent of the award in the recent *Spann* case.  The plaintiff in *Spann* suffered similar injuries to Christensen, but she also had a torn meniscus in her knee and an additional bulging disc.  As such the award of $40,000 is consistent with her recovery.

Christensen has $11,320.63 in economic damages and $40,000 in hedonic damages.  The insurance company of the driver that struck Christensen has already paid $50,000 for these damages.  There is no dispute between the parties that GEICO is liable for any amount of damages above that $50,000 figure.

The court finds in favor Vern Christensen awarding him $1,320.63.

This the 31st day of August, 2009.

/s/ MICHAEL P. MILLS  
**CHIEF JUDGE**  
**UNITED STATES DISTRICT COURT**  
**NORTHERN DISTRICT OF MISSISSIPPI**